WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Melissa Caves, | ) | No. CV 12-513-TUC-CRP |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.  *See* 28 U.S.C. § 636(c). Pending before the Court are Plaintiff's Opening Brief (Doc. 17) ("Plaintiff's Brief"), Defendant's Opposition to Plaintiff's Opening Brief (Doc. 18) ("Defendant's Brief"), and Plaintiff's Reply (Doc, 19).  For the following reasons, the Court remands this matter for an immediate award of benefits.

**BACKGROUND**

In March 2009, Plaintiff protectively filed applications for disability insurance benefits and supplemental social security income under the Social Security Act. (Administrative Record ("AR.") 28, 174, 181). Plaintiff was born in 1982 and has earned a Bachelor of Arts degree. (AR. 81; Plaintiff's Brief, p. 4).  Plaintiff worked from October

2008 to December 2008 as a substitute teacher[1],  in September 2008 as a clerk at a temp agency, in May 2008 as a cashier trainer at a convenience store, in April 2008 in data entry, in December 2007 as a cashier at a hotel, from September 2007 to October 2007 as a dispatcher, and from September 2006 to August 2007 as a cashier at a video store.  (AR. 208).  Plaintiff lives with her sister.  (AR. 60).

Plaintiff asserts that she has been unable to work since March 1, 2008 due to migraines, depression, bipolar disorder and OCD.  (AR. 207). After Plaintiff's applications were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR. 101, 105, 111, 114, 118).  On October 19, 2010, Plaintiff, who was represented by counsel, her sister, and vocational expert ("VE") Ruth Van Vleet testified before ALJ George Reyes ("ALJ").  (AR. 51-96). On December 14, 2010, the ALJ issued his decision finding Plaintiff  was not disabled under the Social Security Act.  (AR. 28-37).  Thereafter, Plaintiff requested Appeals Council Review and submitted additional evidence which the Appeals Council considered in making its determination to deny her request for review.[2]  (AR. 1-5).  Upon the Appeals Council denial of Plaintiff's request for review, the ALJ's December 14, 2010 decision became the final decision of the Commissioner.

---

[1]Plaintiff described her stint as a substitute teacher as follows: "The first assignment I went out on, I was there about an hour and started having a panic attack and had to call my sister to come get me." (AR. 62).  Although Plaintiff attempted to work again as a substitute teacher, she was not given further opportunities:  "after repeated attempts on my part and I was unable to do the job because of panic attacks.  And I was very upset and start throwing up, and so they would have to send me home."  (*Id.*).

[2]When the Appeals Council accepts and considers new evidence in deciding a request for review, that evidence becomes part of the administrative record which the district court must consider when reviewing the Commissioner's final decision for substantial evidence. *See Brewes v. Commissioner of Social Security Administration,* 682 F.3d 1157, 1163 (9th Cir. 2012); *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir 1993).  Therefore, the Court considers Plaintiff's additional evidence accepted by the Appeals Council.

Plaintiff then initiated the instant action, raising the following three grounds for relief: (1) the ALJ failed to account for nurse practitioner Amy Tees' opinion concerning Plaintiff's absences from work due to migraine headaches; (2) the ALJ erroneously rejected the 2010 opinion of treating psychiatrist, Steven J. Bupp, M.D.; and (3) substantial evidence did not support the ALJ's reliance on the opinion of Agency examining psychologist James Armstrong, Ph.D.

**STANDARD**

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (*citing Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (*quoting Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider

the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

**DISCUSSION**

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 C.F.R. §§404.1520, 416.920.  To establish disability, the claimant must show she has not worked since the alleged disability onset date, she has a severe impairment, and her impairment meets or equals a listed impairment or her residual functional capacity ("RFC")[3] precludes her from performing past work.  Where the claimant meets her burden, the Commissioner must show that the claimant is able to perform other work, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.

**THE ALJ'S REJECTION OF TREATING DR. BUPP'S OPINION**

The ALJ found that Plaintiff had the following severe impairments: migraine headaches, obesity, bipolar disorder, obsessive-compulsive disorder, and anxiety disorder. (AR. 30).  He determined that Plaintiff had the RFC to perform medium work, except that she should not use ladders, ropes or scaffolds and she must avoid exposure to hazards such as dangerous machinery and unprotected heights.  (AR. 32).  He also found that although Plaintiff "can attend and concentrate during an 8-hour day with breaks every two hours in a customary manner[,...] Claimant is limited to simple tasks that are not performed in a fast-paced production environment and involve only simple work-related decisions.  Claimant is limited to only occasional conversation or interpersonal interaction with her supervisors or coworkers and further limited to only incidental public contact." (*Id.*).  The ALJ found that Plaintiff had no past relevant work, but based upon testimony from the VE, Plaintiff "would

---

[3]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

be able to perform the requirements of representative light unskilled occupations such as janitor...." (AR. 36).

In reaching his decision, the ALJ gave "little weight" to the opinion of Plaintiff's treating psychiatrist Dr. Bupp, and gave "substantial weight" to the opinion of examining psychologist Dr. Armstrong. (AR. 35). Plaintiff agues that the ALJ erroneously rejected Dr. Bupp's opinion.

It is well-settled that the opinions of treating physicians, like Dr. Bupp, are entitled to greater weight than the opinions of examining or non-examining physicians. *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989) ("We afford greater weight to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")(internal quotation marks and citation omitted); *see also* 20 C.F.R §§ 404.1527, 416.927 (generally, more weight is given to treating sources). An ALJ may reject a treating physician's uncontradicted opinion only after giving "'clear and convincing reasons' supported by substantial evidence in the record." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)). Additionally, "[a] treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record." *Id.; see also Holohan v. Massanari,* 246 F.3d 1195, 1202-1203 (9th Cir. 2001).

In September 2010, Dr. Bupp opined that since March 1, 2008,  Plaintiff has been markedly limited in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; complete a workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without more than the normal rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals

1   or make plans independently of others. (AR. 169-171). Dr. Bupp also opined that Plaintiff
2   was moderately limited in five other areas. (*Id.*). Dr. Bupp further indicated that Plaintiff
3   "continued to deteriorate. She is unable to function for any gainful employment." (AR. 171
4   (also indicating Plaintiff could work 0 hours 0 days per week and would be expected to miss
5   work 30 days per month[4])). He states that these limitations would last more than 12 months.
6   (*Id*).

7       The ALJ rejected Dr. Bupp's opinion because his "treatment records are inconsistent
8   with the GAF scores and his opinion is extreme compared with his treatment observations
9   that claimant was improving while on medication and subsequently deteriorated with stress
10  and anxiety when her mother moved into town." (AR. 35). The ALJ also stated that Dr.
11  Bupp noted no complaints of pain or other symptoms from Plaintiff consistent with his
12  opinion. (*Id.*). He found "Dr. Bupp's and/or claimant's credibility questionable when his
13  treatment records indicate claimant had increased contact with her mother and claimant was
14  caring for her mother, yet in her testimony the claimant denies this was the case....Either Dr.
15  Bupp or the claimant is incorrect in this important fact because if the claimant is taking care
16  of her mother, then she is probably able to care for herself." (*Id.*).

17      Instead, the ALJ gave substantial weight to examining psychologist Dr. Armstrong's
18  June 2009 opinion that Plaintiff's memory was within normal limits and her sustained
19  concentration and persistence, social interaction, and adaptation were within normal limits,
20  but subject to bipolar interference. (AR. 35, 317-18).

21      Plaintiff challenges each reason the ALJ provided for rejecting Dr. Bupp's opinion.
22  Dr. Bupp began treating Plaintiff at CODAC Behavioral Health Services in approximately

23

24      [4]Plaintiff does not rely on Dr. Bupp's statements that Plaintiff could work 0 hours per
25  week and was unable to function for any gainful employment in this litigation. (Plaintiff's
    Reply, p. 5). Such opinions are on an issue that is reserved for the Commissioner. *See* 20
26  C.F.R. § 404.1527(d)(1)-(3); *McLeod v. Astrue,* 640 F.3d 881, 884 (9th Cir. 2011) ("although
27  a treating physician's opinion is generally afforded the greatest weight in disability cases, it
    is not binding on an ALJ with respect to the existence of an impairment or the ultimate
28  determination of disability." (citation and internal quotation marks omitted)).

2008.  (*See* AR.  68 (at October 2010 hearing, Plaintiff testified that Dr. Bupp had been her treating psychiatrist for two years)).  Prior to seeing Dr. Bupp, Plaintiff had been treated beginning in 2002 through her college counseling service at the University of Oklahoma where she was diagnosed with major depression, recurrent; anxiety disorder, NOS; and migraine headaches.  (AR. 297 (Plaintiff was referred for psychiatric evaluation by a school counselor due to problems with depression)).  From 2002 to 2006, Plaintiff was treated through college counseling services by Baiba Ercum, M.D., who throughout that time noted Plaintiff's complaints of depression, anxiety, OCD regarding hand washing, over-eating, insomnia, and nightmares, and prescribed medications for same including Zoloft, Paxil, Lexapro, Trazodone, Alprazolam, Clonazepam, Zyprexa.  (AR. 298-99, 302). Plaintiff also attended counseling.  (*Id.*).  Plaintiff ultimately decided to withdraw from university to move to Arizona "to receive family support."  (AR. 301; *see also* AR. 299 (Plaintiff moved from Oklahoma to Arizona to live with her sister)).  Dr. Ecrum last saw Plaintiff on January 19, 2006.  (AR. 299).  Dr. Ecrum's final diagnoses were: obsessive compulsive disorder, severe; post-traumatic stress disorder; major depression, recurrent; eating disorder, NOS; personality disorder, NOS; migraine headaches; and exogenous obesity.  (AR. 300).

Plaintiff's therapist during treatment in Oklahoma, Jason White, Ph.D., wrote in a January 20, 2006 Termination Summary Report that Plaintiff presented with depression, anxiety (including obsessive-compulsive disorder), family conflict and social isolation, past sexual assault/molestation[5], and childhood experiences of trauma and abuse.  (AR. 301). Plaintiff attended 3 crisis sessions and 106 individual counseling sessions. (AR. *Id.*).  When Plaintiff terminated treatment, she "was experiencing severe symptoms of obsessive-compulsive disorder and resulting disruptions of functioning. [Plaintiff] was depressed." (*Id.*).  As to future therapeutic recommendations, Dr. White indicated that Plaintiff "has an

---

[5]The record reflects Plaintiff's report that she was sexually assaulted by her cousin when she was five years of age.  (*See* AR. 315 (reporting full penile penetration), 393).

1   extensive history of family conflict, abuse (physical, sexual, and verbal/emotional), and
2   trauma.  Trust is difficult as a result." (*Id.*).

3          In late January 2006, soon after leaving Oklahoma, Plaintiff sought mental health
4   treatment at CODAC Behavioral Health. (*See* AR. 393 (indicating January 31, 2006 as "Date
5   of Initial Assessment/Last Review")).  Notes dating back to April 2007 reflect that Plaintiff
6   was taking Ativan for anxiety, Prozac for OCD and depression, and Risperdal for mood
7   instability. (AR. 417).  By August 2007, Nurse Practitioner Bonnie Hoff noted that Plaintiff
8   was taking Prozac, Risperdal, Lamictal, Lorezapam, and had been assessed a GAF score of
9   49. (AR. 413).  Plaintiff also received individual therapy at CODAC.  (*See e.g.,* 393, 398-99,
10  401-03).

11         By January 2009, Dr. Bupp had diagnosed: major depressive disorder, severe without
12  psychotic features; and OCD.  (AR. 380).  At that time, Plaintiff was taking Risperdal,
13  Prozac, Effexor, and Trazadone. (*Id.*).  Throughout early 2009, Dr. Bupp assessed Plaintiff's
14  GAF score at 45.  (AR. 370, 378-9).  By July 2009, Dr. Bupp's diagnoses: included major
15  depressive disorder, severe without psychotic features; OCD; PTSD; obesity, and other
16  neurological disorders.  (AR. 363).  In addition to prescribing Ambien for insomnia, Prozac
17  for OCD, Effexor for depression and anxiety, and Lorazepam for anxiety, he had also started
18  Lithium for mood swings.  (*Id.*).  Plaintiff's GAF score increased to 50.  (AR. 364).  By
19  March of 2010, Dr. Bupp's diagnoses included bipolar/major recurrent depression, severe
20  without psychotic features; OCD; PTSD; obesity; and other neurological disorders.  (AR.
21  556-57).  At that time, Plaintiff was taking Lorazepam, Prozac, Effexor, Lithium-carbonate,
22  and Amitriptyline.  (AR. 557).  He noted that Plaintiff's mother had moved to town and
23  Plaintiff's functioning and symptoms had worsened, she was exhausted and presented as
24  "sick and depressed" on mental status examination.  (*Id.*).  He assessed a GAF score of 45.
25  (*Id.*). Although in May of 2010, Plaintiff reported less panic attacks and OCD, Dr. Bupp
26  questioned whether "that is due to improvement on some dimensions or just depression
27  overriding[.]" (AR. 553 (also noting that Plaintiff was depressed and "doesn't not hold her
28  head up straight due to weariness.")).  In June 2010, Plaintiff presented with "depression and

stress out of control" and reported "much increased OCD–sounds like defense structure (goes and cleans)." (AR. 550). Her GAF score remained at 45. (*Id.*). In October 2010, Dr. Bupp added a prescription for Selegiline. (AR. 592). Dr. Bupp's treatment notes through late 2011 reflect Plaintiff's continued depression, tearfulness, hypomania, and irritability. (AR. 570-71, 575, 577, 584). By November 2011, Plaintiff was taking Lorazepam for anxiety, Lamictal for mood swings, and Prozac for depression. (AR. 571).

When rejecting Dr. Bupp's opinion, the ALJ stated that his "treatment records are inconsistent with the GAF scores...." (AR. 35). Plaintiff argues that the ALJ improperly rejected Dr. Bupp's opinion "based on an unidentified [GAF] score." (Plaintiff's Brief, p. 13 ("The ALJ did not cite any specific GAF score.")). Plaintiff further argues that "[a] GAF score does not have a direct correlation to the severity requirements in mental disorders listings." (*Id.* (citing 65 Fed.Reg. 50746, 50764-65 (2000)). Defendant counters that Dr. Bupp's assessed GAF scores "were regularly 45...indicating serious symptoms but not necessarily indicating that Plaintiff was entirely incapable of all work[]", thus, such score was inconsistent with Dr. Bupp's "extreme" opinion. (Defendant's Brief, p. 14 (citing AR. 35-36)).

Citing the *Diagnostic and Statistical Manual of Mental Disorders IV,* the ALJ recognized that a GAF "score within the range of 41-50...demonstrate[s] serious symptoms or any serious impairment in social, occupational or school functioning." (AR. 34). It is arguable that Defendant misinterprets the ALJ's opinion given that the ALJ states that GAF scores of 45 are "not consistent with mental status evaluations of notes such as judgment OK, 'mood fair', calm affect, and deliberate affect and memory intact." (*Id.*). The ALJ also stated that even when treatment notes indicated "apparent improvement...[Plaintiff] was still classified as having a GAF of 50." (*Id.*). Thus, it could be argued that the ALJ was suggesting that Dr. Bupp's low GAF scores were inconsistent with his findings regarding Plaintiff's mental status rather than, as Defendant posits, not extreme enough to support the conclusion that Plaintiff is unable to work. In either event, Plaintiff is correct that the Social Security Administration has not endorsed GAF scores as a method for evaluating the severity

1    of impairments.  *See*  65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000); *see also Cowen v.*

2    *Commissioner of Social Sec.,* 400 Fed.Appx. 275, 277 n.1 (9th Cir. 2010) (same); *Vose v.*

3    *Astrue,* 2007 WL 4468720, *17 (D.Ariz. Dec.17, 2007) ("[C]ourts have specifically held that

4    a GAF score does not directly correlate to disability." (citations omitted)).  Moreover, when

5    defining GAF scores within the range of 41-50, the ALJ omitted parenthetical information

6    that did correlate to Dr. Bupp's observations as follows: a GAF score within the range of 41-

7    50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent

8    shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g.,

9    no friends, unable to keep a job)."  American Psychiatric Association, *Diagnostic and*

10   *Statistical Manual of Mental Disorders*, p. 32 (4th ed.). The record, including records from

11   CODAC,  is clear that Plaintiff carries a diagnosis of OCD by CODAC providers, has been

12   unable to keep a job, and endorsed suicidal ideation at times.  (*See e.g.* AR 83-84 (Plaintiff

13   testified that while in college she was unable to keep jobs due to panic attacks and OCD);

14   AR. 378 (in note cited by the ALJ, at AR. 34,  to undercut GAF score, Dr. Bupp wrote that

15   Plaintiff's "OCD needs reassurance"); AR. 382 (Plaintiff is "currently unable to maintain

16   long-term employment due to symptoms."); AR. 390 (Plaintiff "has been in treatment since

17   2006 and has not been able to fin[d] employment....She did work[] at a video store but she

18   was not able to keep up with the work, so she quiet [sic]."); AR. 393 (Plaintiff "continues to

19   struggle with finding and securing a job due to ongoing severe migraines and depression."

20   and also noting Plaintiff's statement that "anxiety leads to OCD symptoms."); AR. 394

21   (Plaintiff "reported continuously checking of doors and oven; symptoms interfere w/

22   functioning."); AR. 395 (noting Plaintiff "is here due to her inability to cope [with] the

23   outside world" and "watch/monitor closely due to s[uicidal] i[deation]."[6]); AR. 399 (Plaintiff

24   started job at convenience store and quit the same day because she "couldn't take the stress.

25   It's like I'm not really the one who's doing it; like an out of body experience."); AR. 401

26

27         [6]Plaintiff testified that in December 2008, the same month and year that this
     psychiatric progress note was created, she "was put in a kind of halfway house kind of
28   situation through [CODAC for one week]...because I was suicidal."  (AR. 58-59).

1   (Plaintiff reported anxiety regarding starting a new job the next day, she stated her bulimia

2   had returned and she felt out of control); AR. 550 (Plaintiff reported "much increased

3   OCD...(goes and cleans)."); AR. 570 (some suicidal ideation but no plan, "mostly musings

4   as it would end suffering")).

5        The ALJ also found Dr. Bupp's opinion "extreme compared with his treatment

6   observations that claimant was improving while on medication and subsequently deteriorated

7   with stress and anxiety when her mother moved into town." (AR. 35). The Ninth Circuit has

8   been clear that when "discussing mental health issues, it is error to reject a claimant's

9   testimony merely because symptoms wax and wane in the course of treatment. Cycles of

10  improvement and debilitating symptoms are a common occurrence, and in such

11  circumstances it is error for an ALJ to pick out a few isolated instances of improvement over

12  a period of months or years and to treat them as a basis for concluding a claimant is capable

13  of working." *Garrison v. Colvin,* __ F.3d. __, 2014 WL 3397218 at *18 (9th Cir. July 14,

14  2014); *see also Holohan v. Massanari,* 246 F.3d 1195, 1206 (9th Cir. 2001) (The treating

15  physician's "statements must be read in context of the overall diagnostic picture he draws.

16  That a person who suffers from severe panic attacks, anxiety, and depression makes some

17  improvement does not mean that the person's impairments no longer seriously affect her

18  ability to function in a workplace."). Thus, "[r]eports of 'improvement' in the context of

19  mental health issues must be interpreted with an understanding of the patient's overall well-

20  being and nature of her symptoms." *Garrision,* __ F.3d. __, 2014 WL 3397218 at *18 (citing

21  *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir.2008)).

22       While Dr. Bupp noted Plaintiff's improvement from time to time, Plaintiff's diagnoses

23  of severe major depression and OCD remained constant, and subsequent diagnoses of Bipolar

24  Disorder and PTSD were made adding further to Plaintiff's constellation of mental health

25  issues. Moreover, as discussed above, Plaintiff's GAF scores remained within the 45 to 50

26

27

28

range, except for a period in 2011 when it dropped to 38[7] upon Plaintiff's presentation with suicidal ideation (AR. 570), suspected "shift to irritable-hypomania" (AR. 575), and dysphoric mania with "spotty" memory and "definite cognitive struggle." (AR. 577).  There is simply no basis in the record that any noted improvement was of such magnitude and lasted for such duration so as to undermine Dr. Bupp's September 2010 opinion regarding Plaintiff's abilities to function.  Moreover, in discounting that the arrival of Plaintiff's mother could negatively affect any progress Plaintiff may have been making, the ALJ overlooks the very fact that such a new and significant[8] stressor in Plaintiff's life, instead, supports Plaintiff's reports of increased depression, OCD and panic attacks as well as Dr. Bupp's findings during this time which included depressed mood, disgusted, or blunted affect,

---

[7]A GAF score ranging between 31 and 40 signifies: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p. 32 (4th ed.).

[8]The record supports the conclusion that the arrival of Plaintiff's mother on the scene could constitute a significant stressor given Plaintiff's report that her mother suffered from bipolar disorder since Plaintiff was a child (AR. 393), in 2009 her mother attempted suicide and left a note blaming Plaintiff (AR. 57), and that Plaintiff "has an extensive history of family conflict, abuse (physical, sexual, and verbal/emotional), and trauma." (AR. 301).  Plaintiff testified that being around her mother exhausts her because "[m]y mother reminds me of my abusive childhood, and I have nightmares about that.  And I don't sleep well." (AR. 64; *see also* AR. 542 (CODAC assessment and planning note of Plaintiff's report of "continued anger and frustration with her mother and states that being around her mother triggers PTSD symptoms more often than when she is alone.  However, [Plaintiff] reports reduction in nightmares and a decrease in negative self-talk.")).  Maria Ornelas, BHA, AA, at CODAC noted that Plaintiff "was not doing well.  She seemed very exhausted and overwhelmed because she is having to care for her mother whom [sic] is bip[olar] and depressed. [Plaintiff] would like to coordinate care with mothers [sic] C[ase] M[anager] to get some kind of relief and assistance." (AR. 547).  Additionally, Plaintiff testified that when her mother arrived in Tucson and "got an apartment, she was not able to live on her own. So [Plaintiff] and [her] sister did have to step in and call her CM, her case manager, and try to get her help because she was suicidal."  (AR. 64).

diminished judgment and insight.  (*See* AR.  551-57).

The ALJ also rejected Dr. Bupp's opinion because he "noted no complaints of pain or other symptoms from [Plaintiff] in his treatment notes consistent with his opinion." (AR. 35).  As Plaintiff persuasively points out, Dr. Bupp is a psychiatrist and did not treat Plaintiff for physical pain.  (Plaintiff's Brief, p. 13).  Moreover, Dr. Bupp and other CODAC providers noted Plaintiff's continued reports  of migraines.[9]  (*See e.g.,* AR. 392,  393, 403, 589).

In supporting the ALJ's statement, Defendant argues that "Dr. Bupp's extreme opinion was entirely contradicted by Plaintiff's statements to Dr. Bupp and other CODAC therapists regarding her daily activities and aspirations." (Opposition, p. 15).  As examples, Defendant cites Plaintiff's statements that "she was looking for a job, was engaged in vocational rehabilitation, was interested in pursuing a master's degree or publishing a book, was able to complete activities of daily living, and was able to handle her personal care...", and that she was "planning on going to a concert, and was looking in to [sic] online dating, traveling, and writing a book."  (*Id.*).

Defendant's reliance on Plaintiff's statements to CODAC providers about her aspirations does not undercut Dr. Bupp's findings and opinions.  The record is clear that although Plaintiff did look for a job, and sometimes found employment, she did not maintain such employment.  As to Plaintiff's other aspirations, Plaintiff succinctly points out that "[s]uggestions by a person with bipolar disorder to engage in such activities are not even a scintilla of evidence for full-time work capacity."  (Reply, p. 7; *see also* AR. 65 (Plaintiff testified that she did look into online dating but decided her sister could not afford it and that she never looked into traveling or writing or researching book)).   The record reflects Plaintiff's statement that she had no trouble dressing or with personal hygiene, except sometimes when she is manic. (AR. 316).  That Plaintiff is able to attend to her personal care

---

[9]Despite records from CODAC referencing Plaintiff's report that she suffered from migraines, the ALJ nonetheless discounted Plaintiff's credibility in part because she "did not mention migraine headaches during treatment sessions at CODAC." (AR. 33).

needs and engage in activities of daily living does not necessarily correlate to the ability to sustain full-time work. *See* SSR 96-8p (to be disabled, the claimant must not be able to perform sustained full-time work). The Ninth Circuit has repeatedly asserted that "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)); *see also Vick v. Commissioner of Soc. Sec.,* 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("If claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work.") Thus, "[e]ngaging in activities, including household chores, is not necessarily inconsistent with a finding of disability." *Vick,* 57 F.Supp.2d at 1085. Nor is there any suggestion in the record that Plaintiff spends a *substantial* part of her day engaged in pursuits involving the performance of functions that are transferrable to a work setting. *See Fair,* 885 F.2d at 603. The Honorable Richard Posner succinctly summarized this point:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons..., and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2011). This observation is consistent with *Vertigan* and *Fair.* In the instant case, Plaintiff's ability to attend to her personal care do not negate Dr. Bupp's assessed limitations.

The ALJ also rejected Dr. Bupp's opinion based on the issue of whether Plaintiff cared for her mother. The ALJ found "Dr. Bupp's and/or [Plaintiff's] credibility was questionable..." because Dr. Bupp noted Plaintiff's increased contact with her mother and that she was caring for her mother while Plaintiff "denie[d] this was the case." (AR. 35). The ALJ misstates the record. First, it is reasonable to conclude that Plaintiff's mother's move to Tucson resulted in increased contact between the two as reflected in the CODAC treatment notes. At the hearing, Plaintiff testified that she had given her mother money, "but I have not been like her physical caregiver in the home with her...." (AR. 58). Additionally, the ALJ read from a June 2010 treatment CODAC assessment and service planning note by

Maria Ornelas, BHT, AA, stating that: "'Member needs assistance in coordination of care with mother [sic] C[ase] M[anager]...Member was not doing well.  She seemed exhausted and overwhelmed because she was having to care for her mother, whom [sic] is bip[olar] and depressed.  Member would like to coordinate care with mother's CM to get some kind of relief and assistance.'"[10]  (AR. 63-64).  He then asked Plaintiff whether she was "in fact taking care of [her] mother?" to which Plaintiff replied:

> A.[Plaintiff]:  I was helping her after she, she had moved here, she moved to Tucson, and, me and my sister had not seen her in a couple of years.  We spoke to her doctors, and her doctors said that she would be able to live on her own.  But when she got here and got an apartment, she was not able to live on her own.  So me and my sister did have to step in and call her CM, her case manager, and try to get her help because she was suicidal.
>
> Q. [ALJ]:  You said you were helping her.  Were you helping her in any other way besides what you just told us?
>
> A.  No.
>
> Q.  Then why were you exhausted?
>
> A.  My mother reminds me of my abusive childhood, and I have nightmares about that.  And I don't sleep well.

(*Id.*).  Plaintiff's testimony is consistent with the treatment note the ALJ read into the record.  The evidence of record does not suggest that Plaintiff was caring for her mother beyond that reflected in Plaintiff's testimony which indicates she sought assistance with aspects of her mother's care and may have provided financial assistance.  Moreover, the ALJ's comment that if Plaintiff can care for her mother, then she "is probably able to care for herself" (AR. 35), does not undermine or conflict with Dr. Bupp's opinion or the record as a whole.  As discussed above, there is no suggestion in the record that Plaintiff spends a substantial part of her day engaged in pursuits, such as caring for her mother or herself, which involve the

---

[10]The note quoted by the ALJ is at AR. 547 which is marked as page 21F9 of the record.  The ALJ stated the note was in the record at page 21F3.  (AR. 64).  However, the note that appears at 21F3 (AR. 541) does not contain the language quoted by the ALJ, although the provider did note Plaintiff's report of "continued frustration with her mother and sister, which remind her of her childhood and increase her PTSD symptoms somewhat." (AR. 541).

performance of functions that are transferrable to a work setting. *See Fair,* 885 F.2d at 603.

On the instant record, the ALJ has failed to articulate specific and legitimate reasons supported by substantial evidence of record to reject Dr. Bupp's September 2010 opinion and Defendant's reliance on examining psychologist Dr. Armstrong's 2009 opinion does not alter this conclusion. Defendant argues that the ALJ properly favored Dr. Armstrong's opinion over Dr. Bupp's. Upon examination on June 1, 2009, Dr. Armstrong found that Plaintiff's "answers to question based on the seven DSM-IV criteria for mania suggest that she meets or has recently met all or almost all of these criteria.  She does have  persistently elevated, expansive, or irritable moods, lasting 1 week or any duration if hospitalized...." (AR. 315). He found it doubtful that Plaintiff met the full criteria for PTSD:  "Specifically, I doubt that she meets Criteria F – 'The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.*).  Dr. Armstrong's diagnostic impression was Bipolar I Disorder; OCD now more or less in remission with medication; "Victim of sexual abuse, allegedly"; and Anxiety Disorder NOS. (AR. 317). He noted that Plaintiff would be capable of managing benefits, "but perhaps only marginally." (AR. 318).  Dr. Armstrong opined that Plaintiff's sustained concentration and persistence, social interaction, and adaptation were within normal limits "today" but were "subject to bipolar interference." (AR. 317-18).  Dr. Armstrong does not define or further discuss what he means by "subject to bipolar interference" or how often such interference might be expected to occur.  The frequency of such interference may well impact the ability to sustain full time employment, especially given Dr. Armstrong's statement that Plaintiff experiences "persistently elevated, expansive, or irritable moods..." lasting up to one week, which met DSM-IV criteria for mania.  (AR. 315).

Defendant contends that "the ALJ assessed a residual functional capacity that was in line with the record as a whole when he limited Plaintiff to attending and concentrating for two hour periods, simple tasks that did not need to be performed in a fast-paced environment and involved only simple work-related decisions, and occasional interaction with supervisors and co-workers and incidental contact with the public." (Defendant's Brief, p. 18).  There

is simply no basis on this record for the ALJ to conclude that the limitations he assessed were consistent with functioning "subject to bipolar interference." Moreover, because the ALJ has failed to state specific and legitimate reasons to reject Dr. Bupp's opinion, there is no basis to believe that although Dr. Armstrong found that Plaintiff presented with the ability to function within normal limits on the one day he examined her, such finding could undermine Dr. Bupp's opinion based upon his multiple contacts with Plaintiff and her years of treatment at CODAC. Arguably, Dr. Armstrong's acknowledgment that Plaintiff experienced "bipolar interference" could suggest limitations in line with Dr. Bupp. Regardless, the substantial evidence of record simply does not support the ALJ's rejection of Dr. Bupp's opinion, nor does it support the ALJ's RFC assessment.

**REMAND FOR AN IMMEDIATE AWARD OF BENEFITS**

It is well-settled that "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester,* 81 F.3d at 834 (citation omitted); *Hammock v. Bowen,* 879 F.2d 498 (9th Cir. 1989) (applying credit-as-true rule to medical opinion evidence). *See also Garrison,* __ F.3d. __, 2014 WL 3397281, *19-*22 (9th Cir. July 14, 2014) (reaffirming the credit-as-true rule).

Defendant argues that the credit-as-true rule is not authorized under the Social Security Act. (Defendant's Brief, p. 19 n.11). However, in applying the credit-as-true rule, the Ninth Circuit recently pointed out that "[t]he Social Security Act...makes clear that courts are empowered to affirm, modify, or reverse a decision 'with *or without* remanding the cause for a rehearing.' 42 U.S.C. §405(g)....Accordingly, every Court of appeals has recognized that in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits." *Garrison,* __ F.3d. __, 2014 WL 3397218, at *19 (emphasis in original) (citations omitted). The *Garrison* court went on to state that in appropriate circumstances, the court is empowered to apply the credit-as-true rule and remand the matter with instructions to calculate and award benefits. *Id.* at *20 (providing history and rationale supporting remand for award of benefits where evidence

is credited as true).

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison,* __ F.3d __, 2014 WL 3397218 at *20 (footnote and citations omitted); *see also Benecke,* 379 F.3d at 593(citations omitted). The *Garrison* court also noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Id.* at *20 n. 26 (citing *Smolen v. Chater,* 80 F.3d 1273, 1292 (1996)).  Thus, where the test is met, the Ninth Circuit"take[s] the relevant testimony to be established as true and remand[s] for an award of benefits[,]" *Benecke,* 379 F.3d at 593 (citations omitted), unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled with the meaning of the Social Security Act." *Garrison,* __ F.3d. __, 2014 WL 3397218 at *21 (citations omitted).

Here, remand for an immediate award of benefits is appropriate.  The record has been fully developed and remand for further administrative proceedings would serve no useful purpose.  The VE testified that "there wouldn't be any jobs" for a person with Plaintiff's education and background who was subject to the marked[11] limitations identified by Dr.

---

[11]Defendant "note[s] that 'moderate' and 'marked' limitations are not appropriate for inclusion in the residual functional capacity assessment (or any underlying hypothetical question proffered to the vocational expert)...because they 'do not describe function and do not usefully convey the extent of capacity limitations.'" (Defendant's Brief, p. 13 n.9 (citing *Programs Operations Manual System,* DI 24510.065.B1, 2001 WL 1933372)).  At the hearing when Plaintiff's counsel posed his hypothetical question using the term "markedly limited", the ALJ clarified with the VE whether "the term markedly limited had any

1   Bupp. (*Id.* at p. 77).  *See e.g. Garrison,* __ F.3d __, 2014 WL 3397218 at *22 n. 28 (where

2   the VE answered that a person with the plaintiff's residual functional capacity ("RFC")

3   would be unable to work, "we can conclude that [the plaintiff] is disabled without remanding

4   for further proceedings to determine anew her RFC.").  On this record, crediting Dr. Bupp's

5   opinion as true results in the unquestionable conclusion that Plaintiff is disabled under the

6   Act.

7        Nor, considering the record as a whole, is there reason for serious doubt as to whether

8   Plaintiff is disabled.  For example, the ALJ's finding that Plaintiff was not fully credible does

9   not cast any serious doubt on the record as whole as to whether Plaintiff is disabled.  The

10  ALJ stated that although Plaintiff claimed she suffered from migraines on a frequent basis,

11  she rarely complained of migraines to her primary care physician, Dr. Bhat, and she never

12  complained about migraines during treatment sessions at CODAC.  (AR. 33).  There is no

13  dispute that Plaintiff was treated for migraines at the Center for Neurosciences, primarily by

14  Nurse Practitioner Amy Tees who prescribed various medications and herbal remedies.

15  Although the ALJ takes issue that Plaintiff "rarely" mentioned migraines to Dr. Bhat, the

16  record is clear that Plaintiff sought referral from Dr. Bhat to Nurse Practitioner Tees for

17  treatment of migraines.  (*See e.g.* AR. 439).  Moreover, Plaintiff also informed CODAC

18  providers that she suffered from migraines.  (*See e.g.,* AR. 392, 393, 403, 590).  On at least

19  one occasion, she missed a CODAC appointment because she was suffering from a migraine.

20  (AR. 403).  Another CODAC note states: "more migraines–given gabapentin." (AR. 590).

21  This is not a case where the Plaintiff can be disbelieved because she did not report a problem

22  or seek treatment for same.

23        The ALJ also noted that examining Dr. Armstrong, who conducted a psychological

24  _____

25  vocationally relevant meaning to [her]." (AR. 76).  The VE testified that the form in which

26  Dr. Bupp identified Plaintiff's limitations "says what markedly limited is, meaning they're
    unable to perform the activity at all, or unable to preform it 50 percent of the time. So it does

27  define it." (*Id.*).  On the instant record, use of the term "markedly limited" does not
    invalidate the question posed or the VE's response.

28

1     evaluation, commented that Plaintiff did not complain of pain or appear to be in pain during

2     examination.  (AR. 33; *see also* AR. 312).  Such finding has no significance to Plaintiff's

3     credibility given that she did not allege she was experiencing a migraine or other symptoms

4     during the examination.

5          With regard to Plaintiff's mental impairments, the ALJ appeared to rely on GAF

6     scores to cast doubt upon Plaintiff's credibility.  The Court has already discussed the

7     significance of GAF scores in the context of Dr. Bupp's opinion.  On this record, the GAF

8     scores and contemporary medical records do not undercut Plaintiff's credibility.  The ALJ

9     also cited Plaintiff's statement that "she has no deficits in housework and denied any manic

10    spending sprees.  She stated she had no cognitive trouble with her personal hygiene, but

11    sometimes forgets when she is manic." (AR. 34).  Plaintiff has stated that it takes her longer

12    to complete household chores "due to her manic or depressed state." (AR. 31).  As discussed

13    *supra*, the ability to see to personal hygiene or engage in household chores is not necessarily

14    inconsistent with a finding of disability.  The substantial evidence of record does not

15    establish or remotely suggest that Plaintiff has engaged in activities on a sustained basis that

16    involve the performance of functions that are transferrable to a work setting.

17          In sum, when considering the record as a whole, there is no reason for serious doubt

18    as to whether Plaintiff is disabled.  Plaintiff's treating psychiatrist opined that Plaintiff was

19    markedly limited in several areas.  The ALJ failed to set forth specific and legitimate reasons

20    supported by substantial evidence for rejecting that opinion.  When a hypothetical question

21    was posed to the VE incorporating the marked limitations found by Dr. Bupp, the VE

22    testified that such limitations would preclude Plaintiff from working.  Plaintiff is, therefore,

23    entitled to benefits.

24    **CONCLUSION**

25          The record is fully developed.  The ALJ erroneously rejected treating Dr. Bupp's

26    September 2010 opinion.  The VE testified that a person with Plaintiff's background subject

27    to the marked limitations imposed by Dr. Bupp would not be able to work.  On the instant

28

1   record, there is no serious doubt about whether Plaintiff is disabled.[12]  Accordingly,

2        IT IS ORDERED that this action is REMANDED to the Commissioner for immediate

3   calculation and award of benefits.

4        The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file

5   in this matter.

6        DATED this 12th day of September, 2014.

8   _____

9   **CHARLES R. PYLE**
    **UNITED STATES MAGISTRATE JUDGE**

---

[12]Because Plaintiff has established that she is disabled under the Act in light of the ALJ's erroneous rejection of Dr. Bupp's opinion, there is no need to address Plaintiff's alternative argument that the ALJ improperly rejected nurse practitioner Tees' opinion regarding Plaintiff's migraines.